**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5380-16T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTONIO CUNNINGHAM, a/k/a
TONY CUNNINGHAM, and ANTHONY
CUNNINGHAM,

    Defendant-Appellant.

_____

Submitted May 23, 2018 — Decided June 25, 2018

Before Judges Manahan and Suter.

On appeal from Superior Court of New Jersey,
Law Division, Camden County, Indictment No.
16-02-0456.

Joseph E. Krakora, Public Defender, attorney
for appellant (Stefan Van Jura, Deputy Public
Defender II, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney
for respondent (Adam D. Klein, Deputy Attorney
General, of counsel and on the brief).

PER CURIAM

    Defendant Antonio Cunningham appeals from his conviction

after pleading guilty to amended charges of first-degree

aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1) (count one) and third-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a), 2C:15-1(a)(1) (count five).  Specifically, defendant challenges the trial court's denial of his motion to suppress statements made to police.  Defendant argues that he was illegally arrested without probable cause prior to the time he gave the statement and therefor the statement should be suppressed pursuant to the "fruit of the poisonous tree doctrine."  Having carefully reviewed the record and the arguments raised on appeal, we affirm.

Following an indictment returned by a Camden County Grand Jury, defendant moved to suppress statements given to Detective Paul Hafner and Detective Michael Shomo of the Cherry Hill Police Department who, at the time, were assigned to the Camden County Prosecutor's Office, Homicide Unit (CCPO).  Defendant gave the statement after receiving his Miranda[1] warnings.  A testimonial hearing on the motion took place on October 28 and November 9, 2016.  On November 9 and November 17, 2016, the judge rendered an oral opinion and entered an order denying defendant's motion.

In June 2017, defendant entered into a plea agreement.  During his plea, defendant admitted to striking H.H.[2] in the head on

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

[2]  We use initials to protect the privacy of the family of the victim.

February 24, 2015, and acknowledged that he acted under circumstances manifesting an extreme indifference to H.H.'s life. Additionally, defendant pled guilty to an amended charge of theft. He was sentenced on July 21, 2017 to a fifteen-year term of imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, with a five-year period of post-release parole supervision as to count one, and a concurrent five-year term of imprisonment as to count five. Appropriate fines and fees were imposed, jail credits given, and the remaining counts of the indictment were dismissed.

Defendant was employed by the River Road Trucking Company (RRTC) in Camden. Due to his primary duty to assist with early morning deliveries, defendant was permitted to reside at the premises. The victim, H.H., was employed by RRTC and also lived at the premises. H.H.'s primary duty was to distribute toll monies to the truck drivers each morning.

Around midnight on February 24, 2015, H.H. was in the trucking company office sitting in his recliner when George Valentine, the owner of RRTC, gave him $500 in separate envelopes for distribution to the drivers the following morning. Valentine did not observe defendant but because the bathroom light was on, he "believed [defendant] was in the bathroom because his bike was next to the sofa where he slept."

At around 4:45 a.m. on February 24, 2015, an employee of RRTC arrived at the office to retrieve his toll monies. After calling out for H.H. without receiving a response, the employee entered the office and found H.H. unconscious in his recliner. The employee called 9-1-1.

Police and detectives from the CCPO responded to the scene. H.H. was transported to Cooper Hospital where he was pronounced dead. The coroner ruled his death a homicide caused by blunt force trauma to the head.

That same day, recorded statements were taken from RRTC employees at the prosecutor's office. A follow-up interview with Valentine was conducted by Detective Frank Smith, during which time consent was given to obtain surveillance video of the exterior premises of the trucking company. Smith and Valentine watched the video together. The video depicted defendant exiting the RRTC office at 1:26 a.m. and walking around the side of the office. Defendant then proceeded to go towards the back of the office. As a result of what was depicted in the video, defendant was considered a person of interest.

Valentine left the prosecutor's office and returned to RRTC. Soon afterward, he corresponded with the CCPO that defendant was seen on a bicycle traveling in the direction of the RRTC. Hafner and Shomo responded to the RRTC parking lot. While at that

A-5380-16T1

location the detectives were approached by defendant, who said to them, "I heard you guys were looking for me." Defendant then agreed to give a recorded statement at the CCPO and accompany the detectives in their vehicle.

Since the police vehicle did not have a partition, for the detectives' safety, defendant was frisked, handcuffed and placed in the rear of the police vehicle,[3] along with defendant's bicycle.

Defendant was then transported to the CCPO. Upon arrival, defendant was placed in a small, locked[4] interview room where the handcuffs were removed. Defendant was administered his Miranda warnings and voluntarily gave a recorded statement. Defendant was detained for several hours after the statement while a further investigation was conducted based upon the content of the statement. Defendant was ultimately released. After several additional interviews with other witnesses, defendant was eventually charged with the murder of H.H.

---

[3] Our Supreme Court noted in State v. Dickey, that it is State Police practice that when there is no partition between the front and rear of the car, troopers handcuff any rear-seat passengers. 152 N.J. 468, 473 (1998).

[4] It is unclear as to whether the door was locked, but the court found it was locked because the alternative would be unreasonable; interviewees would be able to roam the prosecutor's office, a repository of sensitive information.

POINT I

DEFENDANT'S STATEMENT MUST BE SUPPRESSED
BECAUSE IT WAS OBTAINED AS A DIRECT RESULT OF
AN ARREST DEVOID OF PROBABLE CAUSE, U.S.
CONST., AMEND. IV; N.J. CONST., ART. I, [¶]
7.

[A.] Defendant was Unlawfully
Arrested.

[B.] The Taint of the Unlawful
Arrest Was Not Purged Before
Defendant Gave His Statement.

Defendant contends that his conveyance and detention at the CCPO prior to the statement constituted an unreasonable seizure under the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. Defendant argues that as a result of the illegal seizure, the "fruit" of his subsequent statement should have been suppressed. To the contrary, the State argues that defendant was voluntarily transported to the CCPO and that, thereafter, his detention was investigatory.

We review orders granting motions to suppress evidence giving deference to the trial court's findings of fact that are supported by sufficient credible evidence in the record. State v. Gamble, 218 N.J. 412, 424 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). In the usual case, we accept those findings because they "are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Id. at 424-25 (alteration in

original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We disturb a trial court's findings of fact only when "so clearly mistaken 'that the interests of justice demand intervention and correction.'" Elders, 192 N.J. at 244 (quoting Johnson, 42 N.J. at 162.) Our review of a trial court's legal conclusions is plenary. State v. Handy, 412 N.J. Super. 492, 498 (App. Div. 2010) (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

When analyzing a warrantless search and seizure, we start with the parameters defined by our Federal and State Constitutions. These protections require police to first secure a warrant before seizing a person or conducting a search of a home or a person. State v. Watts, 223 N.J. 503, 513 (2015); State v. Reece, 222 N.J. 154, 167 (2015).

> [B]oth the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee to New Jersey's citizens "[t]he right to walk freely on the streets of a city without fear of an arbitrary arrest." State v. Gibson, 218 N.J. 277[, 281] (2014). When evaluating the reasonableness of a detention, the "totality of circumstances surrounding the police-citizen encounter" must be considered. State v. Privott, 203 N.J. 16, 25 (2010) (quoting [State v. Davis, 104 N.J. 490, 504 (1986)]).
>
> [State v. Coles, 218 N.J. 322, 343 (2014) (alteration in original).]

As this court has noted, police officers do not necessarily place someone in custody simply by asking them to accompany them to a police station.  See State v. Purnell, 310 N.J. Super. 407, 421-22 (App. Div. 1998).

The Constitution also allows a person the privilege, "upon noting a police presence, to decide that he or she wishes to have nothing to do with the police, without risking apprehension solely by reason of the conduct manifesting that choice." State v. L.F., 316 N.J. Super. 174, 179 (App. Div. 1998) (quoting State v. Ruiz, 286 N.J. Super. 155, 162-63 (App. Div. 1995)).

While the "warrantless seizure of a person is 'presumptively invalid as contrary to the United States and the New Jersey Constitutions,'" Coles, 218 N.J. at 342 (quoting State v. Mann, 203 N.J. 328, 337-38 (2010)), there remains a critical "balance to be struck between individual freedom from police interference and the legitimate and reasonable needs of law enforcement."  Id. at 343.

Applying our standard of review, we are satisfied that the judge's credibility and other factual findings from the suppression hearing are well-founded.  There is ample support in the record for the judge's finding that defendant was not under arrest or in custody when he agreed to accompany the detectives to the CCPO.

A-5380-16T1

While we agree that defendant was subjected to investigative detention while at the CCPO, we do not agree that the detention became a "de facto" arrest.

An investigative stop may become "a de facto arrest when 'the officers' conduct is more intrusive than necessary for an investigative stop.'" Dickey, 152 N.J. at 478 (quoting United States v. Jones, 759 F.2d 633, 636 (8th Cir. 1985)). Although there is no bright-line test to determine when an investigative stop becomes a de facto arrest, courts have identified several considerations relevant to the determination, including, most significantly, the temporal duration of the stop. An important concern in that regard "is whether the officer used the least intrusive investigative techniques reasonably available to verify or dispel his suspicion in the shortest period of time reasonably possible." Davis, 104 N.J. at 504. "Another factor is 'the degree of fear and humiliation that the police conduct engenders.'" Dickey, 152 N.J. at 479 (quoting United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994) (quoting United States v. Lego, 855 F.2d 543, 544-45 (8th Cir. 1988))).

Here, the detectives believed that defendant was a person of interest in a homicide. The detectives' encounter with defendant, which he initiated, and defendant's agreement to accompany them was not consistent with an arrest. The detectives sought to obtain

a statement from defendant and the manner in which they obtained the statement was no more intrusive then required for the purpose of the detention.

In sum, we conclude that under the totality of the circumstances presented here, prior to defendant's statement, he was not under arrest. As such, the judge correctly denied defendant's motion to suppress.

Finally, on appeal the State argues that should we conclude that the "seizure" of defendant was unlawful, predicated upon sufficient attenuation, the exclusionary rule would not apply. See State v. Smith, 155 N.J. 83, 100, cert. denied, 525 U.S. 1033 (1998). In the ordinary cause, [e]vidence obtained as the fruit of an unlawful search or seizure must be suppressed." Ibid. (citations omitted). However, as our Supreme Court has held, the precept stated in the exclusionary rule will not apply where the connection between police illegality and the seizure of evidence is sufficiently attenuated. See, e.g., State v. Williams, 192 N.J. 1, 15 (2007); Smith, 155 N.J. at 100.

Given our decision on the issue of the legality of defendant's seizure, we need not address the attenuation argument, which was not raised before the motion judge.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5380-16T1